```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF NEW JERSEY
```

|  |  |
|---|---|
| In re:<br><br>NICKELS MIDWAY PIER, LLC<br><br>        Debtor.<br><br>NICKELS MIDWAY PIER, LLC;<br>JOHN NICKELS; ANGELO NICKELS;<br>and STEVEN NICKELS,<br><br>        Appellants,<br><br>    v.<br><br>WILD WAVES, LLC,<br><br>        Appellee. | HONORABLE JOSEPH E. IRENAS<br>CIVIL ACTION<br>NO. 11-289 (JEI)<br><br>BANKRUPTCY NO. 03-49462(GMB)<br><br>**OPINION** |

**Appearances:**

TEICH GROH
By: Brian W. Hofmeister, Esq.
691 State Highway 33
Trenton, New Jersey 08619
    Counsel for Nickels Midway Pier, LLC

SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY
By: Fredric R. Cohen, Esq.
Fairway Corporate Center
4300 Haddonfield Road
Pennsauken, New Jersey 08109
    Special Litigation Counsel for Nickels Midway Pier, LLC

ARCHER & GREINER, P.C.
By: Jerrold S. Kulback, Esq.
One Centennial Square
Haddonfield, New Jersey 08033
    Counsel for John, Steven and Angelo Nickels

HORNSTINE WERTHEIMER & PELLONI, LLC
By: Louis F. Hornstine, Esq.
1518 Walnut Street, Suite 1600
Philadelphia, Pennsylvania 19102
    Counsel for John, Steven and Angelo Nickels

COZEN O'CONNOR
By: Arthur J. Abramowitz, Esq.
Jerrold N. Poslusny, Jr., Esq.
Liberty View, Suite 300
457 Haddonfield Road
Cherry Hill, New Jersey 08002
    Counsel for Wild Waves, LLC


FORD, FLOWER & HASBROUCK
By: Willis F. Flower, Esq.
Central Square
New Road & Central Avenue, Suite 42A
P.O. Box 405
Linwood, New Jersey 08221
    Counsel for Wild Waves, LLC

**IRENAS**, Senior District Judge:

This matter comes before the Court on the appeal of Debtor Nickels Midway Pier, LLC ("Nickels") and John, Steven and Angelo Nickels ("the Nickels Brothers")[1], from the Bankruptcy Court's order of October 8, 2010 estimating the claim of Wild Waves, LLC ("Wild Waves").[2]  For the reasons that follow, the Court will affirm in part and remand in part.

---

[1] The Court will refer to Nickels and the Nickels Brothers collectively as "Nickels" unless otherwise indicated.

[2] For mainly procedural reasons not relevant to the instant appeal, this Court previously vacated and remanded the Bankruptcy Court's Order of October 8, 2010.  However, upon remand, in an Order dated December 17, 2010, the Bankruptcy Court reaffirmed the October 8th Order.

**I.**

Both Nickels (the debtor) and Wild Waves proposed plans of reorganization.[3] An estimation of Wild Waves claim, pursuant to 11 U.S.C. § 502(c)(1)[4], was necessary to determine the feasibility of Nickels' plan.[5] The Bankruptcy Court held an estimation hearing on June 16 and 18, 2010. With regard to the conduct of the hearing, the Bankruptcy Court explained,

---

[3] The parties' related disputes in and out of the instant bankruptcy suit, and the appeals of those disputes, are too numerous to cogently discuss in any one opinion. Thus, the instant opinion only contains the facts most relevant to the issues raised by the instant appeal. Additional discussions of the facts and procedural history of this case, and related litigation, may be found at *Nickels Midway Pier, LLC v. Wild Waves, LLC*, 341 B.R. 486 (D.N.J. 2006), *aff'd* 255 F.App'x 633 (3d Cir. 2007); *Nickels Midway Pier, LLC v. Wild Waves, LLC*, 372 B.R. 218 (D.N.J. 2007); *In re: Nickels Midway Pier, LLC (Nickels Midway Pier, LLC v. Wild Waves, LLC)*, 383 B.R. 595 (D.N.J. 2008), *aff'd* 348 F.App'x 781 (3d Cir. 2009); *In re: Nickels Midway Pier, LLC*, 2010 WL 415328 (D.N.J. Jan. 28, 2010); *Scottsdale Ins. Co. v. Weiner*, 2010 WL 445649 (D.N.J. Feb. 1, 2010); *In re: Nickels Midway Pier, LLC (Nickels Midway Pier, LLC v. Wild Waves, LLC)*, 2010 WL 3881376 (D.N.J. Sept. 28, 2010).

[4] "There shall be estimated for purpose of allowance under this section--(1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c)(1). "The essence of section 502(c) is that 'all claims against the debtor be converted into dollar amounts.'" 4-502 Collier on Bankruptcy ¶ 502.04 (quoting H.R. Rep. No. 595, 95th Cong., 1st Sess. 354 (1977) Rep. 989, 95th Cong., 2d Sess. 65 (1978)).

[5] Wild Waves' plan, not Nickels' plan, was ultimately confirmed. However, the Bankruptcy Court's rulings with respect to Wild Waves' claim are still relevant insofar as they affect any payment the equity interest holders (i.e., the Nickels Brothers) will receive under the confirmed plan.

3

> [i]n order to obtain an overall valuation of the claim of Wild Waves without the extensive [sic] and cost required for a full blown claims hearing which the parties have suggested would require weeks of hearings, this Court has allowed the claimant, Wild Waves to present evidence related to the merits of its claim, including opinion of experts, on an expedited basis, and then allowing the debtor and principals to rebut claimant's evidence though the use of fact and expert testimony.

(Pa183-- Transcript of Motion Decision)

The following issues were addressed at the estimation hearing, and decided by the Bankruptcy Court in an oral opinion on September 27, 2010.

Wild Waves' claim is based on two agreements concerning an amusement pier ("the Pier") in Wildwood, New Jersey. The first is an agreement whereby Nickels agreed to sell the Pier to Wild Waves ("the Sale Agreement"). The second is an agreement pursuant to which Nickels leased a portion of the Pier to Wild Waves ("the Lease Agreement") for the operation of a water park.

With regard to the Sale Agreement, it is undisputed that the parties did not close on the sale of the Pier in January, 2003, as the agreement contemplated.[6] The Bankruptcy Court found that Nickels did not intend to convey the property (because it has always asserted that there is no enforceable Sale Agreement) and therefore breached the Sale Agreement.

---

[6] Indeed, the parties did not close on the sale until 2011, pursuant to the confirmed Third Modified, First Amended Plan for Liquidation of Nickels Midway Pier, LLC.

4

In calculating the damages resulting from Nickels' breach, the Bankruptcy Court estimated Wild Waves' loss of rental income from January, 2003 forward to be $2.3 million, and also credited Wild Waves with $3,171,668.00-- the balance of insurance proceeds Nickels received from a fire that occurred on the Pier in 2002.[7]

With regard to the Lease Agreement, the Bankruptcy Court held that Nickels breached paragraph 19 of the lease, which obligated Nickels "to maintain the existing access to and egress from the Leased Premises," by placing game kiosks in front of the water park entrance. The Bankruptcy Court estimated damages, in the form of lost revenue due to lower attendance, to be $1,052,948.[8]

In the instant appeal, Nickels challenges almost every decision the Bankruptcy Court made in estimating Wild Waves' claim.

**II.**

The District Court has jurisdiction to hear appeals from final judgments, orders and decrees of the Bankruptcy Court in cases and proceedings referred pursuant to 28 U.S.C. § 157(a) to

---

[7] The parties signed the Sale Agreement in 1999. As will be discussed further *infra*, the Bankruptcy Court held that the Sale Agreement placed the risk of loss on Nickels.

[8] The Bankruptcy Court estimated Wild Waves' total claim to be $6,524,616 ($1,052,948 + $3,171,668 + $1,052,948).

5

the Bankruptcy Court.  28 U.S.C. § 158(a).

The District Court reviews *de novo* the legal determinations of the Bankruptcy Court.  *In re: Jersey City Medical Center*, 817 F.2d 1055, 1059 (3d Cir. 1987).  The Bankruptcy Court's factual determinations will be left undisturbed on appeal unless they are clearly erroneous.  Fed. R. Bankr. P. 8013.

With respect to estimation hearings, "[i]n reviewing the method by which a bankruptcy court has ascertained the value of a claim under Section 502(c)(1), an appellate court may only reverse if the bankruptcy court has abused its discretion." *Bittner v. Borne Chemical Co.,* 691 F.2d 134, 135 (3d Cir. 1983).

**III.**

Nickels asserts that the Bankruptcy Court made many errors in estimating Wild Waves' claim.  Specifically, Nickels asserts that the Bankruptcy Court erred in holding that Nickels breached either the Sale Agreement or the Lease Agreement.  Alternatively, Nickels asserts that even if the Bankruptcy Court was correct about the breaches, it made many errors in calculating damages. Lastly, Nickels asserts that the Bankruptcy Court failed to address its substantial claims against Wild Waves, which, Nickels argues, should be set-off against Wild Waves' claim.

## A.

### (1)

With regard to the breach of the Sale Agreement, the Bankruptcy Court opined,

> [b]ecause the agreement of sale provided that the closing would take place in January of 2003, Wild Waves seeks damages for losses alleged for the failure of the debtor to close at that time. Although the debtor asserts that Wild Waves was also not prepared to close in January 2003, it is clear to this Court, as it was to Judge Seltzer as provided in his opinion, and consistently uncontested in both Courts, that the debtor disputed its obligation to sell the pier to Wild Waves, and regardless of what preparations Wild Waves made to close, the debtor would not go forward with the sale.

(Pa190-- Transcript of Motion Decision)

Before this Court Nickels asserts the same argument that it did below; namely, that it could not have breached the Sale Agreement because Wild Waves never tendered the purchase price for the Pier. Quoting *Vidal v. Transcontinental & Western Air., Inc.*, Nickels apparently suggests that neither it, nor Wild Waves, should be liable for a breach:

> Payment and delivery are concurrent conditions since both parties are bound to render performance at the same time. . . . In such a case, as Williston 1 points out, neither party can maintain an action against the other without first making an offer of performance himself. Otherwise, if each stayed at home ready and willing to perform each would have a right of action against the other. . . . to maintain an action at law the plaintiff must not only be ready and willing but he must have manifested this before bringing his action, by some offer of performance to the defendant, . . . It is one of the consequences of concurrent conditions that a situation may arise where no right

> of action ever arises against either party . . . so long as both parties remain inactive, neither is liable.

120 F.2d 67, 68 (3d Cir. 1941).

The principle set forth in *Vidal* is inapplicable here because, as the Bankruptcy Court found, Nickels did not simply "stay[] at home ready and willing to perform" on January 31, 2003. *Id.*[9]  To the contrary, Nickels repudiated the Sale Agreement in 2001 when it vigorously opposed Wild Waves' claim for specific performance in the state court litigation before Judge Seltzer, asserting that no enforceable contract existed. (See Pa1-Pa14-- Judge Seltzer's letter opinion)  Because Nickels repudiated the agreement, Wild Waves was not required to tender the purchase price. *See Levy v. Mass. Acc. Co.*, 124 N.J. Eq. 420, 430-31 (Ch. 1938) ("Where one party wrongfully repudiates a contract, -- says that he will no longer perform or be bound by its terms, . . . the wronged party may refuse to consider the contract terminated and may sue to compel the wrongdoer to perform its terms.  On the other hand, upon such wrongful repudiation there thereby accrues to the wronged party the right, if he so chooses, to terminate the contract, -- to say that the contract has become terminated by the defendant's wrongful act, -- and to sue for damages therefor."); *Albert v. Ford Motor Co.*,

---

[9] *Vidal* is also distinguishable insofar as it applied New York and Missouri law, 120 F.2d at 69, whereas New Jersey law applies to the issue presented here.

112 N.J.L. 597, 603 (E. & A. 1934) (holding that once one party conclusively manifests its intention not to perform a bilateral contract, "[o]f course the law does not compel [the other party] to do a useless act."); *see generally* 10-54 Corbin on Contracts § 975 ("In the case of a bilateral contract for an agreed exchange of performances, a repudiation of his duty by one of the parties terminates the duty of the other.").

The Bankruptcy Court did not err in holding that Nickels breached the Sale Agreement.

**(2)**

Next Nickels asserts that the Bankruptcy Court miscalculated the damages resulting from the breach of the Sale Agreement, which consisted of: (a) "loss of rental income from [January, 2003] forward, and . . . [(b)] the insurance proceeds from the loss of the income producing [portion] of the Pier." (Pa191--Transcript of Motion Decision)

*Lost rental income*

The Bankruptcy Court relied upon the report of Wild Waves' expert (Mr. Baratz)[10] which calculated lost net rental income by deducting "a vacancy credit, operating expenses, replacement

---

[10] It does not appear that Nickels submitted its own expert report or testimony on this issue.

9

reserve and management fee" (Pa192-- Transcript of Motion Decision; see also, Pa221-- Schedule 4 to Baratz Report) from the tenant rent (i.e., gross rents) figure.  Nickels argues that the Baratz Report's expenses figure was too low, and that the tenant rent figure was too high.

Nickels argues that the Baratz report failed to take into account other significant expenses-- namely, real estate taxes and interest on Wild Waves' purchase money financing-- thereby resulting in an inflated figure for lost net rental income.

With regard to real estate taxes, Wild Waves has conclusively demonstrated that the Baratz Report did, indeed, include real estate taxes as part of "operating expenses,"[11] and thus, this Court concludes that the Bankruptcy Court did not fail to incorporate real estate taxes into its estimation of lost net rental income.

With regard to interest on Wild Waves' purchase money financing, Nickels asserts that "interest . . . on the $2 million purchase money financing at 8.5% [which] amounts to $170,000/year," (Nickels' Brief, p. 11) was omitted from the Baratz Report's calculation of expenses.  However, Wild Waves

---

[11] The Baratz report relied upon a previous expert report by Mr. Bainbridge, which explicitly incorporates real estate taxes into the category "operating expenses." (Pa284)  The operating expenses in the Baratz report are identical to the operating expenses in the Bainbridge report. (Compare Pa284 with Pa221)

10

asserts that interest was properly excluded because it was "effectively offset" by the "money freed up by the termination of [Wild Waves'] rental obligation to [Nickels],"-- $250,000 per year-- upon the sale of the Pier.  (Wild Waves' Brief, p. 13)

In their reply brief, Nickels asserts that Wild Waves' argument is flawed because "it incorrectly assumes that mortgage interest should not be included as an expense" and the "$702,350 of gross rent utilized by Mr. Bainbridge was already net of the $115,000 of rents from [Wild Waves]."  (Nickels Reply Brief, p. 6)

It does not appear that the Bankruptcy Court addressed the issue of mortgage interest.  As the case will be remanded for additional reasons, this Court will leave this issue for determination by the Bankruptcy Court in the first instance.

Nickels also argues that the tenant rent figure was too high because it was undisputedly based on market rents, rather than actual rents.  The Bankruptcy Court explained why market rents were used: "the Court rejects [Nickels' suggested] approach [of using actual rents] because some of the debtor's tenants are insiders or entities owned by insiders[12], which makes those figures less reliable in a fair market valuation."  (Pa192, Transcript of Motion Decision)  This Court finds the Bankruptcy

---

[12] Nickels states that 5 of 11 leases were granted to insiders.  (Nickels Brief, p. 12)

11

Court's decision to be logical and not an abuse of discretion.[13]

*Insurance proceeds*

With regard to insurance proceeds, the Bankruptcy Court stated,

> the debtor received $3,992,920 in insurance proceeds after the fire loss of the Castle and Dungeon, which covered loss of the structures and contents, which

---

[13] Nickels makes two other unavailing arguments.

First, it asserts that the tenant rent figure was too high because it improperly included rent from a "Frogger" game kiosk that Wild Waves would have moved upon the sale of the Pier because it blocked the entrance to the waterpark. The Court agrees with Wild Waves' observation that Nickels' argument assumes without any factual support that Wild Waves would have *removed* the kiosk from the Pier rather than merely *relocating* it to a different position on the Pier. (It is also worth noting that even by Nickels' own estimate, the total rent from the Frogger kiosk was only $145,000-- 6.3% of the total tenant rent figure.)

Second, Nickels asserts that the Bankruptcy Court should have "retroactively charged Wild Waves with interest on the Pier purchase price." (Nickels Brief, p. 14)  This argument makes no sense when one remembers that the issue presented is the amount of damages Wild Waves suffered as a result of Nickels' breach of the Sale Agreement. It is basic hornbook law that "[c]ompensatory damages are designed to put the injured party in as good a position as he would have had if performance had been rendered as promised." *Donovan v. Bachstadt*, 91 N.J. 434, 444 (1982); *see also* Restatement (Second) of Contracts § 347, comment a ("[c]ontract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed."). If the contract had been performed, Wild Waves would have paid the purchase price in exchange for the Pier. Thus, its damages are the value of the Pier minus the purchase price; not the value of the Pier minus the purchase price with interest. Nickels repudiated the contract, therefore it may not benefit from any increase in the property's value after 2003.

> would have belonged to Wild Waves had the sale gone forward and the fires not occurred, or if the debtor had rebuilt the income-producing structures from the insurance proceeds.
>     Steven Nickels testified that the debtor invested $821,252 back into . . . the pier. Using that figure, Wild Waves would be entitled to an estimated claim of $3,171,668 [$3,992,920 - $821,252] as its loss. Because the agreement of sale placed the risk of loss on the debtor, and the debtor failed to replace the income-producing structures and to close, Wild Waves suffered losses which this Court estimates to be $3,171,668.

(Pa191– Transcript of Motion Hearing)

From these few sentences, this Court cannot clearly discern why the Bankruptcy Court awarded the insurance proceeds to Wild Waves. And perhaps more importantly, the award seems to be inconsistent with the Bankruptcy Court's method of calculating the reduced purchase price for the Pier under the Sale Agreement. (See pages 13-14 of this Court's opinion, issued on even date herewith, affirming the Bankruptcy Court's confirmation of Wild Waves' Third Modified, First Amended Plan of Liquidation.)

Wild Waves puts forth two arguments for why they should receive the insurance proceeds: (1) Nickels separately breached Paragraph 12(b) of the Sale Agreement, wherein Nickels promised to add Wild Waves as an "additional insured" under its property damage insurance policy; and (2) the Sale Agreement required Nickels to rebuild the Dungeon and Castle. However, Nickels asserts several counter-arguments, to which Wild Waves has several responses.

These issues were not discussed by the Bankruptcy Court in its oral opinion, and this Court cannot infer how the Bankruptcy Court ruled on these arguments. While the Bankruptcy Court's statement that Nickels "failed to replace the income-producing structures" of the Pier might suggest that the Bankruptcy Court implicitly held that Nickels had a duty to replace the Dungeon and Castle, it is not clear from where that duty arose. Nickels and Wild Waves dispute whether the Sale Agreement incorporates the Lease's provision that Nickels will "repair" the leased premises in the event it is "partially damaged by fire" (Pa613-Lease Paragraph 24), and even assuming *arguendo* that the Sale Agreement does incorporate the provision, "repair" does not necessarily mean "rebuild."

Accordingly, this Court will remand to the Bankruptcy Court the issue of damages for Nickels' breach of the Sale Agreement.

**B.**

**(1)**

The Bankruptcy Court held that Nickels breached Paragraph 19 of the Lease which provides, in relevant part, "[Nickels] agrees to maintain the existing access to and egress from the Leased Premises in its current condition, so as to ensure a free flow of pedestrian traffic into and out of the Leased Premises." (Pa612-- Lease Paragraph 19) Specifically, the Bankruptcy Court found

that Nickels placed the Frogger game kiosk in the entranceway to the waterpark, thereby "somewhat" obstructing access.[14]  (Pa675-- Bankruptcy Court's Opinion of September 30, 2009, incorporated by reference in the oral opinion of September 27, 2010 (Pa184))

Nickels argues that the Bankruptcy Court's factual finding as to the placement of the Frogger kiosk was "without any basis," (Nickels Brief, p. 22) and therefore clearly erroneous.  The Court disagrees.  The Bankruptcy Court expressly stated that its decision was based on photographs in which "it is visible . . . that the entranceway is obstructed."  (Pa184-- Transcript of Motion Hearing)  Nickels ignores these photographs.

The Bankruptcy Court's finding was not clearly erroneous, therefore its holding that Nickels (non-materially) breached the Lease will be affirmed.

**(2)**

Nickels next argues that even if the Bankruptcy Court correctly held that Nickels breached the lease, Wild Waves cannot carry its burden of proving that the breach caused any damages because the expert reports it relied upon failed to meet the requirements of Fed. R. Evid. 702 and *Daubert v. Merell Dow Pharm., Inc.*, 509 U.S 579 (1993), and therefore, should have been

---

[14]  The Bankruptcy Court held that the breach was not material-- that pedestrians could "easily negotiate around" the kiosks-- but that Wild Waves "has a claim for damages."  (Pa675)

excluded.[15]

To establish damages resulting from the partial obstruction of the entranceway to the waterpark, Wild Waves relied upon the expert reports of Dr. Francis, a cognitive psychologist, and Mr. Baratz, a certified public accountant.  Dr. Francis opined that the obstruction to the entranceway reduced attendance by one third (due to factors such as reduced visibility to passers-by) (Pa186), and Mr. Baratz then "value[d] the decrease in attendance" in terms of lost revenue.  (Pa186)

At the estimation hearing, Nickels' counsel twice objected to Dr. Francis's report and testimony asserting that it was inadmissible (Pa377-79; Pa536-38)[16]; and also objected to the admissibility of Mr. Baratz's report and testimony (Pa534-38). The Bankruptcy Court stated that it would "take [the objections] under advisement."  (Pa379)[17]

In issuing its estimation decision, however, the Bankruptcy Court never conducted a Rule 702 / *Daubert* analysis.  With respect to Dr. Francis, the Bankruptcy Court's merely stated,

---

[15]  The Federal Rules of Evidence apply in bankruptcy proceedings.  Fed. R. Bankr. P. 9017.

[16]  Mr. Kulback specifically objected to Dr. Francis' methodology, asserting that it was "well beyond any degree of reasonable scientific certainty."  (Pa379)

[17]  The Bankruptcy Court later stated to Nickels' counsel, "I'm overruling your objection.  You're on the record," (Pa538), but the hearing transcript is not clear as to what objection was being overruled.

16

"[w]hile [Dr. Francis'] methodology appears to follow scientific methods and suggests that reduced attendance has resulted, the one-third calculation [for decreased attendance] seems high when considering the actual relationship of visibility to attendance." (Pa185)  The Bankruptcy Court then said, "[i]t is this Court's conclusion that a loss of attendance resulted from the obstruction by the kiosks, but in a much smaller percentage. . . . For the purpose of this estimation hearing, Court will utilize a ten-percent reduction related to the loss of attendance." (Pa189)

Similarly, with respect to Mr. Baratz's report and testimony, the Bankruptcy Court said that it "consider[ed] the data he relied upon in reaching his conclusions and the methodology he employed," but did not explicitly analyze whether his methods "'rest[ed] on a reliable foundation.'"  *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (quoting *Daubert*).

Accordingly, this Court will remand the issue of Wild Waves' damages resulting from the breach of the Lease for a Rule 702 / *Daubert* analysis of the admissibility of the expert reports and testimony of Dr. Francis and Mr. Baratz.[18]

---

[18] Quoting *Bittner*, Wild Waves suggests that the Bankruptcy Court was not required to conduct a Rule 702 / *Daubert* analysis. 691 F.2d at 135 (stating that the Bankruptcy Court may use "whatever method is best suited to the particular contingencies at issue" in estimating claims).  However, the Bankruptcy Court

C.

Lastly, Nickels asserts that the Bankruptcy Court erred by apparently ignoring its claims against Wild Waves which include: (a) the $389,182.50 judgment Judge Simandle entered in favor of Nickels in the fire insurance litigation, see 2010 WL 445649; (b) Nickels' claim for pre-petition rent and taxes, which Judge Hillman stated was "approximately $594,007.50" but remanded to the Bankruptcy Court for determination in "a single integrated proceeding" consistent with the Bankruptcy Court's stated intention to address together breaches of the Sale Agreement and Lease, 2010 WL 3881376 at *7-8; and (c) Nickels asserts, without much explanation, that it is entitled to the $900,000 Wild Waves received from its business interruption insurance after the Castle & Dungeon fire because, Wild Waves succeeded in getting rent abated as a result of the fire.  Nickels reasons that Wild Waves saved $1,517,823 in rent, therefore Nickels should get the $900,000.

The Bankruptcy Court did not address these issues, and Wild

---

itself seemed to indicate that it intended to conduct such an analysis when it said it would take under advisement Nickels' objections to the expert reports and testimony.

Moreover, nothing in *Bittner* supports a conclusion that a Bankruptcy Court may estimate claims based on potentially unreliable expert evidence, over the express objection of a party.  In *Bittner*, the Third Circuit affirmed the bankruptcy court's decision to "forego an extraneous Estimation Hearing under § 502(c)" in favor of a "trial on the papers" procedure where "the claims were actually adjudicated."  300 F.3d at 357.

Waves' submission ignores these issues.  The Bankruptcy Court should address these issues on remand.[19]

### IV.

For the reasons set forth above, the Bankruptcy Court's Order of October 8, 2010, will be affirmed as to its holdings that Nickels breached the Sale Agreement and the Lease.  As to Wild Waves' damages resulting from the beaches, and any appropriate set-off to which Nickels may, or may not, be entitled, the Court will remand for further proceedings consistent with this opinion.  The Court will enter an appropriate order.

Dated: April 25, 2011

                                      s/ Joseph E. Irenas  
                                 JOSEPH E. IRENAS, S.U.S.D.J.

---

[19] As the Court discussed with counsel at oral argument, the issues are relevant only insofar as they may or may not be set-off against Wild Waves' claim.  No adversary actions have been filed against Wild Waves, therefore the Bankruptcy Court has not been asked to enter a judgment against Wild Waves.

19